UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

APRIL NICOLE BEDINGFIELD, ET AL.        CIVIL ACTION NO. 09-369

VERSUS                                   JUDGE S. MAURICE HICKS, JR.

LARRY C. DEEN, ET AL.                    MAGISTRATE JUDGE HORNSBY

### MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment (Record Document 70) filed by the Defendants, Bossier Parish Sheriff Larry C. Deen ("Sheriff Deen"), Warden Mark Toloso ("Warden Toloso"),[1] Assistant Warden Lieutenant Jerry Sims ("Assistant Warden Sims"),[2] and St. Paul Fire and Marine Insurance Company.  Plaintiffs opposed the motion, but have conceded certain issues.  See Record Document 115.  For the reasons which follow, the Motion for Summary Judgment is **GRANTED** and all claims against Defendants are **DISMISSED**.

### PROCEDURAL BACKGROUND

This is a civil action for monetary damages brought by Mrs. Elizabeth Bedingfield, and her minor granddaughter, Elizabeth Macy Bedingfield (through her mother and natural tutrix, April Nicole Bedingfield) in connection with the death of Jimmy "Trey" Bedingfield, III, their son and father respectively.[3]  Plaintiffs seek damages in connection with Trey

---

[1]Mark Toloso was the Warden of the Work Release Facility at the time of Trey Bedingfield's participation in that program.

[2]Jerry Sims was the Assistant Warden of the Work Release Facility at the time of Trey Bedingfield's participation in that program.

[3]Mr. Jimmy Elton Bedingfield, II was also a Plaintiff in this matter.  Mr. Bedingfield passed away on February 8, 2011.  On April 27, 2011, the Court ordered that Elizabeth Bedingfield, the surviving spouse and named executrix of the estate of the  deceased plaintiff, Jimmy Elton Bedingfield, II, be substituted as a plaintiff for the decedent.  See

Bedingfield's death on September 3, 2008, after having been incarcerated in the Bossier Parish Work Release Jail Facility, which was operated by the Bossier Parish Sheriff's Office.  More specifically, Plaintiffs seek to recover damages arising out of and caused by the alleged failure of Defendants to provide proper and reasonable medical care and treatment to Trey Bedingfield and to properly and timely discover, diagnose, and treat his colon cancer.  Plaintiffs also seek damages in relation to the following:  refused treatment due to threats made by prison officials; denial of family visitation; and failure to notify the family regarding Trey Bedingfield's medical condition.  Plaintiffs filed suit under 42 U.S.C. §§ 1981, 1983, and 1988; the First, Eighth, and Fourteenth Amendments to the United States Constitution; and Louisiana state law (negligence).  Defendants have now moved for summary judgment dismissing all of Plaintiffs' claims.

## FACTUAL BACKGROUND

Trey Bedingfield was convicted of felony theft.  See Record Document 70, Exhibit 1 (Conviction Records).  On November 27, 2007, he was sentenced to serve five years at hard labor, with three years suspended and with credit for time served.  See id.  At that time, Trey Bedingfield was thirty-three years old.  See id.

On January 18, 2008, Trey Bedingfield was accepted into the Bossier Parish Sheriff's Office Work Release Facility.  See Record Document 70, Exhibit 2 at ¶ 2 (Warden Toloso Affidavit).  He was employed by Hardware Resources and began working on January 21, 2008.  See id.  Trey Bedingfield worked at Hardware Resources from Monday through Friday, and did not work on weekends.  See id., Exhibit 2 at ¶¶ 2-3.  Trey

---

Record Document 134.

Bedingfield only missed five work days due to illness from January 2008 through May 2008. See id., Exhibit 2 at ¶ 3.  Trey Bedingfield's last day of employment at Hardware Resources was Friday, May 23, 2008 and he had worked every Monday through Friday without missing work due to illness since March 21.  See id.

On Sunday, March 2, 2008, Trey Bedingfield saw Bossier Parish Sheriff Paramedic Karman Hall.  See Record Document 70, Exhibit 3 at ¶ 3 (David Gorman, R.N. Affidavit) & Exhibit 3-A (Medical Records).  Trey Bedingfield complained of nausea, vomiting, diarrhea, weakness, and jaundice.  See id.  He was referred to LSU Hospital in Shreveport, Louisiana for evaluation.  See id.

Trey was evaluated by physicians at LSU Hospital, and returned from LSU Hospital on March 4, 2008 with an order for an esophagogastroduodenoscopy ("EGD") procedure on March 13, 2008.  See id.  After the March 2, 2008 evaluation, LSU Hospital issued the following orders:

> Medicine Clinic with Dr. Wroblicky on March 20, 2008, at 12:30 p.m.  This will be to follow-up the results of the esophagogastroduodenoscopy performed earlier as well as checking a reticulocyte count and a CBC in respect to his anemia.
>
> Otherwise, it is discussed with the patient at the time of his discharge he is to avoid any and all aspirin-type products including Pepto-Bismol, nonsteroidal anti-inflammatory medications, as well as BC Powders.

Id., Exhibit 3-A at Bates 136.  Trey Bedingfield called his mother either the day of or the day after his release from LSU Hospital.  See Record Document 70, Exhibit 9 at 52-53 (Elizabeth Bedingfield Deposition).

Registered Nurse David Gorman ("Nurse Gorman"), who was employed by the Bossier Parish Sheriff's Office, made arrangements and prepared instructions for jail

personnel regarding Trey Bedingfield's transport for the March 13, 2008 EGD procedure.

<u>See</u> Record Document 70, Exhibit 3 at ¶ 4.  This included preparing documents for the

work release facility to follow before Trey Bedingfield appeared for the appointment, placing

restrictions on what Trey Bedingfield could eat prior to the procedure, and restricting the

medications Trey Bedingfield could take prior to the procedure.  <u>See</u> Record Document 70,

Exhibit 3 & Exhibit 3-A at Bates 169, 177, 167, 170.

On March 9, 2008, Trey Bedingfield forwarded a "KITE COMMUNICATION FORM"

to Assistant Warden Sims indicating that he was refusing the EGD procedure.  <u>See</u> Record

Document 70, Exhibit 3 at ¶ 4, Exhibit 3-A at Bates 152, and Exhibit 4 at ¶ 2 (Assistant

Warden Sims Affidavit).  Trey Bedingfield wrote:

> Lt. Simms I'm suppose [sic] to go back to the Hospital on the 13th and have
> a scope ran down in my stomach to check for ulcers.  Its [sic] not a life
> threatening deal or anything.  I have medical insurance threw [sic] Willis
> Knighton and my own doctor I've had for years.  I get out Aug 8 this year, I
> would rather him do this when I get out.  I would like to turn down going back
> to the hospital if thats [sic] ok.  I feel fine since I've been back.  Thank you.

<u>See id.</u>  On March 10, 2008, Trey Bedingfield also signed a "Refusal of Medical Treatment

Form," wherein he stated that he refused the "M.D. Appointment" and "Medical Treatments

scheduled or ordered for [him] by the medical staff."  <u>See</u> Record Document 70, Exhibit 3

at ¶ 4, Exhibit 3-A at Bates 172, and Exhibit 4 at ¶ 2.  Trey Bedingfield further stated:

> I am signing this on my own free will without any coercion.  I was informed
> of the consequences of refusal, which may directly affect my medical
> condition.  I accept these consequences and release Bossier Sheriff's
> Department, Bossier Parish Police Jury, and/or medical staff of all legal
> ramifications concerning this matter.

<u>See id.</u>, Exhibit 3-A at Bates 172.  Nurse Gorman stated in his deposition that Trey

Bedingfield told him he did not want to attend the EGD procedure.  <u>See id.</u>, Exhibit 3 at ¶

4.

Relying upon the affidavit of Elizabeth Bedingfield, Plaintiffs contend that "Sheriff employees had Trey sign a refusal of medication form without specifying the medication or treatment on or about March 9 or 10, 2008."  Record Document 115-4 at ¶ 20.  Plaintiffs also construe the phrase "if that's ok" in the KITE COMMUNICATION FORM as Trey Bedingfield posing a medical question to Assistant Warden Sims.  Id.; see also Record Document 115-1 at 5-6.  Plaintiffs note that this "medical question" went unanswered. Record Document 115-1 at 5-6.

On March 19, 2008, Trey Bedingfield complained of stomach cramps and of vomiting "clear water."  See id., Exhibit 3 at ¶ 5 & Exhibit 3-A.  He was seen by Nurse Gorman on that same date.  See id.  Trey  Bedingfield did not report any other symptoms.  See id. Nurse Gorman gave the inmate several Pepto Bismol tablets.[4]  See id.  He also advised the inmate and Assistant Warden Sims that if Trey Bedingfield complained of increased abdominal pain that evening, he should be sent to LSU for further evaluation, as Nurse Gorman would not be on duty that evening.  See id.  According to Nurse Gorman, Trey Bedingfield made no further report of medical problems until May 6, 2008.  See id., Exhibit 3 at ¶ 6.

On May 6, 2008, Trey Bedingfield was seen by Nurse Gorman for a complaint of chest pain.  See id.  Nurse Gorman performed an EKG.  See id.  He also drew blood and

---

[4]Nurse Gorman, who is not a named defendant in this case, attested that he "was not aware of any orders in place from LSU Hospital or any other physician from [the] March 2, 2008 evaluation at LSU Hospital, other than what the inmate should not eat or what medication not to take in advance of the EGD procedure."  Record Document 70, Exhibit 3 at ¶ 5.

forwarded it to LSU Hospital for evaluation.  See id.  Nurse Gorman also scheduled Trey Bedingfield to see a physician at the next doctor visit at the jail on May 9, 2008.  See id.

On May 9, 2008, Dr. Russell Roberts ("Dr. Roberts") saw Trey Bedingfield on referral for the May 6 report of chest pain.  See Record Document 70, Exhibit 5 at¶ 2 (Dr. Russell Roberts Affidavit).  Dr. Roberts reviewed Trey Bedingfield's medical chart, including Nurse Gorman's notes.  See id.  Dr. Roberts also evaluated the blood work and EKG that had been performed by Nurse Gorman on May 6.  See id.  Dr. Roberts discussed Trey Bedingfield's symptoms with him.  See id.  Dr. Roberts examined Trey Bedingfield, including a rectal exam because of complaints of urinary frequency.  See id.  According to Dr. Roberts, Trey Bedingfield did not report any weight loss.  See id.  A follow-up appointment was scheduled for Trey Bedingfield in four weeks, at which time additional blood work would be evaluated and compared with the May 6, 2008 blood work.  See id.

The next report by Trey Bedingfield of any medical problem was on May 27, 2008, at which time he complained of abdominal pain and was seen by Nurse Gorman.  See Record Document 70, Exhibit 3 at ¶ 6.  Nurse Gorman examined Trey Bedingfield and immediately had him sent to LSU Hospital for evaluation.  See id.  According to Nurse Gorman, the May 27 visit was the first time the Trey Bedingfield indicated he had experienced weight loss.  See id.  Trey Bedingfield was admitted to LSU Hospital on May 27, 2008 and was diagnosed with metastatic cancer.

Despite the medical treatment outlined above, Plaintiffs contend that the medical treatment of Trey Bedingfield was "minuscule and inadequate."  Record Document 115-2 at ¶ 5.  Plaintiffs also contend that Trey Bedingfield experienced more medical problems, but did not report them because of intimidation and threats utilized by Warden Toloso.  See

id. at ¶¶ 6-9; Record Document 115-1 at 4.  According to Plaintiffs, the intimidation and threats began on February 11, 2008, when Warden Toloso chastised Trey Bedingfield for missing work due to an alleged back injury.  See id.  Plaintiffs maintain that Trey Bedingfield did not report his medical problems because he did not want to be removed from the Work Release Program and placed back into the general prison population.  See Record Document 115-2 at ¶ 7.  These contentions are based on alleged statements made by Trey Bedingfield to his family and friends.[5]

Defendants have presented the expert report of Dr. Alan B. Grosbach ("Dr. Grosbach"), who opined "that more likely than not Mr. Bedingfield's cancer was not only present but already widely metastatic at the time of his March hospitalization."  Record Document 70, Exhibit 5 (Dr. Grosbach Expert Report).  He based this medical "conclusion on the well-established slow growth rate of colon cancer."  Id.  He further explained:

> When patients with this cancer present with iron deficiency anemia due to gastrointestinal bleeding their cancers have already been present for months or years because such bleeding occurs slowly and the anemia develops gradually allowing time for cancer to metastasize.
>
> Colon cancers double in size over periods of one to two months or longer. This means the metastatic tumors in Mr. Bedingfield's liver and elsewhere would have been present in March and would have been at least one-quarter to one-half the size they had achieved on CT scan and at surgery in late May.  They could not have developed de novo in the interval between March 4 and May 28.
>
> It is certainly true that Mr. Bedingfield's cancer probably worsened and the metastatic tumors grew during the March-May interval, but his cancer would still have been incurable had it been diagnosed in March.  . . .  I believe that

---

[5]Defendants object to the hearsay evidence offered by Plaintiffs.  See Record Document 129 at 3-4.  Defendants further note that there is no hearsay exception applicable in this matter.  See id. at 4-7.  This issue will be more fully discussed in the Law and Analysis section of the instant Memorandum Ruling.

more likely than not Mr. Bedingfield's cancer had already progressed beyond
the point of potential curability by the time of his March 2008 hospitalization.
Diagnosis at that time instead of in May would not have improved his chance
of survival.

Id.

In his affidavit, Warden Toloso stated that he as not aware of any medical problems experienced by Trey Bedingfield that were not addressed.  See Record Document 70, Exhibit 2 at ¶ 10.  In fact, Warden Toloso stated that he was not aware of any serious medical problems experienced by Trey Bedingfield until May 31, 2008, after Trey Bedingfield's admission to LSU.  See id., Exhibit 2 at ¶¶ 8, 10.  Warden Toloso was also unaware that Trey Bedingfield experienced any weight loss while housed at the Work Release Facility.  See id., Exhibit 2 at ¶ 10.  Warden  Toloso also attested that he "did not tell or encourage [Trey] Bedingfield not to seek medical treatment or not to report medical problems."  See id., Exhibit 2 at ¶ 7.

Likewise, Assistant Warden Sims stated in his affidavit that he was not aware of any serious medical needs or problems of Trey Bedingfield prior to his admission to LSU on May 27, 2008.  See Record Document 70, Exhibit 4 at ¶ 3.  Like Warden Toloso, Assistant Warden Sims attested that he was not aware of any request by Trey Bedingfield for medical treatment that was not provided.  See id.

Inmates such as Trey Bedingfield are allowed telephone privileges at the Work Release Facility each day upon his return from employment.  See Record Document 70, Exhibit 2 at ¶ 9. These telephone calls are recorded, but are only maintained temporarily for security reasons.  See id.  Because telephone calls at the work sites are not monitored, inmates are not permitted to make or receive phone calls at their work place.  See id. Inmates such as Trey Bedingfield are permitted supervised visitation at the Work Release

Page 8 of  35

Facility; however, they are not permitted to have visitors at the work sites, as there were no jail personnel present.  See id.

Inmates, including Work Release inmates, are also not ordinarily permitted to have visitation while receiving treatment at LSU Hospital because the LSU Hospital is not a secure facility.  See Record Document 70, Exhibit 2 at ¶ 8; Exhibit 7 (LSUHSC-S University Police Department Policies and Procedures) at 8.  In relation to the handling of prisoner patients, the LSU Hospital Policy provides:

> c.     While in the hospital all prisoner/patients shall be shackled through th use of hand and/or leg restraints.  Prisoner/patients will only be unshackled in the detention cell or as directed by the treating physician.
>
> . . .
>
> 4.     All guarded prisoner/patients will be denied visitors except terminal cases and those cases with special consideration as approved by the custodial authority and hospital administration.

Id., Exhibit 7 at 8.

In his affidavit, Warden Toloso stated that he was contacted by someone at LSU Hospital on Saturday, May 31, 2008, regarding a request that Trey Bedingfield be permitted to have visitors.  See Record Document 70, Exhibit 2 at ¶ 8.  He was also informed that Trey Bedingfield had a terminal illness.  See id.  According to Warden Toloso, he "notified LSU the same day that under those circumstances visitation and telephone calls would be allowed."  Id.; see also Exhibit 8 (LSU Progress Notes) ("5-31-08 "Permission granted by jail facility to notify family of pt's situation and visitation is allowed.").  Warden Toloso further attested that he "was never made aware that [his] approval was not followed."  Record Document 70, Exhibit 2 at ¶ 8.

Trey Bedingfield's family visited him daily at LSU starting on June 1, 2001.  See Record Document 70, Exhibit 10 (April Bedingfield Deposition) at 34-35, 40-42; Exhibit 11 (Elizabeth Turner Deposition) at 30-36.  Trey Bedingfield's family chose not to visit him while he was incarcerated, but had unrestricted telephone communications while he was incarcerated.  See id., Exhibit 9 (Elizabeth Bedingfield Deposition) at 40, 52-53, 180-182.

## LAW AND ANALYSIS

### I.      Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6]  Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010).  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004).  If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004).  Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted.  See Boudreaux v. Swift Transp. Co., 402 F.3d 536,

_____

[6]The Court notes that the newly amended Rule 56 requires that there be "no genuine *dispute* as to any material fact," but this change does not alter the Court's analysis. F.R.C.P. 56(a) and advisory committee's note (emphasis added).

540 (5th Cir.2005).

## II.   Conceded Claims.

Louisiana Civil Code Articles 2315.1 and 2315.2 list the parties who may pursue survival and wrongful death actions.  The first category of parties under both articles is "the surviving spouse and child or children of the deceased, or either the spouse or the child or children."  La.C.C. Arts. 2315.1(A)(1) and 2315.2(A)(1).   April Nicole Bedingfield is the "former wife" of Trey Bedingfield; thus, she is not a "surviving spouse" as contemplated by Articles 2315.1 and 2315.2.  See Record Document 1, ¶ 1(a).  Conversely, Elizabeth Macy Bedingfield is the surviving child of Trey Bedingfield; thus, she possesses the sole right to pursue the remedies under these articles, exclusive of both Trey Bedingfield's parents and his former wife.

The Fifth Circuit has held that courts must look to state law rules to determine who has standing to bring a survival action and a wrongful death claim under Section 1983.  See Aguillard v. McGowen, 207 F.3d 226, 231 (5th Cir. 2000); Brazier v. Cherry, 293 F.2d 401, 409 (5th Cir.1961).  Thus, Elizabeth Macy Bedingfield possesses the sole right to pursue survival action and wrongful death remedies under Section 1983, exclusive of both Trey Bedingfield's parents and his former wife.

Plaintiffs have conceded that April Nicole Bedingfield has no individual claims.  See Record Document 115-1 at 2.  They agree that she is the proper party to assert the survival and wrongful death action on behalf of her minor daughter, Elizabeth Macy Bedingfield. See id.  Thus, due to Plaintiffs' concession, the Motion for Summary Judgment is **MOOT** on the aforementioned issues.

III.    **Denial of Medical Care Claim.**

A.    **Hearsay.**

As noted in the Factual Background section of the instant Memorandum Ruling, much of Plaintiffs' evidence submitted in opposition to the Motion for Summary Judgment is comprised of alleged verbal assertions made by Trey Bedingfield prior to his death.  The majority of this evidence relates to Plaintiffs' contention that Trey Bedingfield did not report medical problems and/or ask for additional medical treatment due to threats/intimidation by Warden Toloso.   Plaintiffs contend that "the statements regarding Trey's mental, physical and emotional condition, illness and symptoms of illness were made on Trey's personal knowledge contemporaneously with Trey's experiences with them, as were the statements regarding threats of repercussions that interfered with and violated Trey's constitutional rights." Record Document 140 at 4.  Plaintiffs make the conclusory assertion that these statements, set forth in affidavits and referred to in deposition testimony, are admissible under Federal Rules of Evidence 803, 804, and 807.  However, Plaintiffs supply little or no analysis, no application of the law to the facts at hand, and only two case citations from non-controlling jurisdictions.

Defendants argue that much of the evidence submitted by Plaintiffs in opposition to the Motion for Summary Judgment should be disregarded because the deposition excerpts and affidavits are inadmissible, either on the grounds of hearsay or no personal knowledge. See Salas v. Carpenter, 980 F.2d 299, 304 (5th Cir. 1992); Martin v. John W. Stone Oil Distributor, Inc., 819 F.2d 547 (5th Cir. 1987); Resolution Trust Corp. v. Starkey, 41 F.3d 1018 (5th Cir. 1995); Grimes v. Texas Dept. of Mental Health & Mental Retardation, 102 F.3d 137 (5th Cir. 1996).  Defendants contend:

> Based entirely on alleged statements by Trey Bedingfield, hearsay without any applicable exception, [P]laintiffs contend that the inmate was "threatened" with removal from the work release program for reasons that vary depending on the source of the alleged statement by Bedingfield.  He allegedly related that he would be removed if he was too ill to work, but also if he reported medical problems or if he missed work due to illness.  Each of the multiple versions allegedly relayed by the inmate are different, but [P]laintiffs also even misstate the hearsay testimony offered.  For example, April Bedingfield's version is relied upon by [P]laintiffs, yet she testified that the inmate simply told her:
>
> > He didn't want to go back into the hospital because he wanted to stay in the work release [program]….
>
> (Plaintiffs' Exhibit 1, April Bedingfield deposition, p. 66, line 2-4).  Of course, prisoners must be physically able to work, which is all that the above statement means even if it were admissible.

Record Document 129 at 4.  Defendants argue this type of hearsay evidence is not admissible.  See id.   The Court agrees.

First, the challenged evidence is not admissible under Rule 803(3), the state of mind exception.[7]  Defendants argue that this exception is inapplicable because it "only applies to a contemporaneous statement made about the declarant's current state of mind or medical condition, not a previous mental state or condition or, more importantly, why he had such a state of mind."  This position is supported by Fifth Circuit case law, which provides:

_____

[7]Plaintiffs argue in conclusory fashion that Trey Bedingfield's statements are admissible under the Federal Rules of Evidence:

To the extent that any of the challenged statements may be considered hearsay, [P]laintiffs believe that most are admissible in evidence under the well-established exceptions to the hearsay rule set forth in Federal Rules of Evidence, Rules 803-807.

Record Document 140 at 4.

Although a witness may testify to what the declarant stated as to the declarant's then existing state of mind, ***the "state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind***."

Spring v. Beverly Enterprises Mississippi, Inc., No. 99-60174, 2000 WL 178163, *3 (5th Cir.

Jan. 25, 2000) (emphasis added).  In United States v. Cohen, 631 F.2d 1223 (5th Cir.

1980), the Fifth Circuit explained in great detail the limitations of Rule 803(3):

> [Rule 803(3)] by its own terms excepts from the ban on hearsay such statements as might have been made by Cohen of his then existing state of mind or emotion, but expressly excludes from the operation of the rule a statement of belief to prove the fact believed.  The rule thus permitted the witnesses to relate any out-of-court statements Cohen had made to them to the effect that he was scared, anxious, sad, or in any other state reflecting his then existing mental or emotional condition.  And this for the purpose of proving the truth of the matter asserted in the statement-that Cohen actually was afraid or distraught-because the preamble to F.R.E. 803 provides that such testimony "is not excluded by the hearsay rule."  But the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition-"I'm scared"-and not belief-"I'm scared because Galkin threatened me."

Cohen, 631 F.2d at 1225.  Under this controlling case law, Plaintiffs are simply unable to present, under the state of mind exception, the reason why Trey Bedingfield allegedly did not report his medical problems.

Additionally, Trey Bedingfield's statements do not fall within the dying declaration exception set forth in Rule 804(b)(2).  In Shepard v. United States, 290 U.S. 96, 99-100, 54 S.Ct. 22, 23-24 (1933), the Supreme Court explained the parameters of the dying declaration exception to the hearsay rule:

> To make out a dying declaration, the declarant must have spoken without

hope of recovery and in the shadow of impending death. . . .

Fear or even belief that illness will end in death will not avail of itself to make a dying declaration.  There must be a settled hopeless expectation that death is near at hand, and what is said must have been spoken in the hush of its impending presence.  Despair of recovery may indeed be gathered from the circumstances if the facts support the inference. There is no unyielding ritual of words to be spoken by the dying.  Despair may even be gathered, though the period of survival outruns the bounds of expectation.  What is decisive is the state of mind.  ***Even so, the state of mind must be exhibited in the evidence, and not left to conjecture.*** The patient must have spoken with the consciousness of a swift and certain doom.

Shepard, 290 U.S. at 99-100, 54 S.Ct. at 23-24 (emphasis added).  Once again, Plaintiffs offer no evidence, or even a convincing argument, that Trey Bedingfield's statements regarding threats and intimidation were spoken without hope of recovery and in the shadow of impending death.  Additionally, the fact that Trey Bedingfield had received a terminal cancer diagnosis is not dispositive of admissibility under the dying declaration exception. See Sternhagen v. Dow Co., 108 F.Supp.2d 1113, 1118-1119 (D.Mont. 1999).   The Sternhagen court explained that "to satisfy the dying declaration exception, the statement must relate to the cause or circumstances of the declarant's impending death.  See id. at 1117, citing United States v. Mobley, 421 F.2d 345, 346-48 (5th Cir.1970) (statement made in hospital by victim who had been shot and beaten, describing assailants and events). Here, according to the expert testimony of Dr. Grosbach, Trey Bedingfield's statements do not "relate to the cause or circumstances of" his impending death because his cancer was already terminal in March of 2008, the first time he made a medical complaint to prison officials.

Finally, Plaintiffs' reliance on Rule 807[8] is also misplaced.  Rule 807's residual exception "is to be used only rarely, in truly exceptional cases."  U.S. v. Phillips, 219 F.3d 404, 419 (5th Cir. 2000); see also U.S. v. Walker, 410 F.3d 754, 757 (5th Cir. 2005).  The proponent of the hearsay statements "bears a heavy burden to come forward with indicia of both trustworthiness and probative force."  Phillips, 219 F.3d at 419.  "In order to find a statement trustworthy, a court must find that the declarant of the statement was particularly likely to be telling the truth when the statement was made."  Id. (internal citation and quotations omitted).  Additionally, "a witness's death is not enough to justify discarding the trustworthiness requirement of the residual hearsay exception."  Stolarczyk ex rel. Estate of Stolarczyk v. Senator Intern. Freight Forwarding, LLC, 376 F.Supp.2d 834, 842 (N.D.Ill. 2005).  Given this high standard, district courts have considerable discretion in deciding whether to apply the residual exception.  See Phillips, 219 F.3d at 419.

In support of admission under Rule 407, Plaintiffs note that the challenged "statements were made in frequent and direct conversations between Trey Bedingfield and

---

[8]Rule 807 provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

his mother" and "Trey Bedingfield and his longtime friend, Brent Weir."  Record Document 140 at 3.  Plaintiffs also state that "some of the statements are verified in the medical records from the sheriff's office, in the hospital records and in other documents provided to [P]laintiffs during discovery."  Id. at 4.  As to trustworthiness, Plaintiffs note the contemporaneous nature and consistency of Trey Bedingfield's statements.  They also maintain that Trey Bedingfield had no motive to fabricate these statements.  However, in asserting these arguments, Plaintiffs fail to make specific citations to competent summary judgment evidence.  Likewise, as noted by Defendants, Plaintiffs argue the applicability of Rule 807 without reference and/or legal application to specific deposition or affidavit evidence.  Plaintiffs simply make the conclusory assertion that the residual hearsay exception is applicable.[9]  Thus, based on the showing made in the record and in light of the heavy burden faced by a party seeking to invoke Rule 807, this Court simply cannot find an indicia of reliability and/or circumstantial guarantees of trustworthiness sufficient to invoke Rule 807.  The Court, therefore, sustains Defendants' hearsay objections relating to Plaintiffs' proffered evidence regarding Trey Bedingfield's alleged failure to report his medical problems because of intimidation and threats.

**B.    Section 1983 Claim.**

"[I]adequate medical care by a prison doctor can result in a constitutional violation

---

[9]"Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  Malacara v. Garber, 353 F.3d 393, 405 (5thCir. 2003); see also Nissho-Iwai American Corp. v. Kline, 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); cf. U.S. v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

for purposes of a § 1983 claim when that conduct amounts to deliberate indifference to the prisoner's serious medical needs, constituting the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999) (internal citation and quotations omitted).  Under the deliberate indifference standard, "a prison official is not liable unless the official knows of and disregards an excessive risk to inmate health or safety." Id. at 534.  Put another way, "a showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006).  "Deliberate indifference is an extremely high standard to meet." Id.  Therefore, although inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not. See Stewart, 174 F.3d at 533.  "Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind." Id.

"Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997). Mere negligence, neglect or medical malpractice does not amount to a denial of a constitutional right as these actions on the part of the Defendants do not rise to the level of a constitutional tort. See Daniels v. Williams, 474 U.S. 327, 329-30, 106 S.Ct. 662, 664 (1986).  Prisoners are not constitutionally entitled to the best medical care that money can buy. See Mayweather v. Foti, 958 F.2d. 91 (5th Cir.1992).  Additionally, it has been consistently held that an inmate who has been examined by medical personnel fails to set

forth a valid showing of deliberate indifference to serious medical needs.  See Norton, 122

F.2d  at  292  (5th  Cir.1997);  Callaway  v.  Smith  County,  991  F.Supp.  801,  809

(E.D.Tex.1998); Spears v. McCotter, 766 F.2d 179 (5th Cir.1985); Mayweather, 958 F.2d

at 91.

> Here, Plaintiffs' deliberate indifference argument can be summarized as follows:

> It is clearly repugnant to observe the deliberately indifferent actions of the
> defendants Toloso and Sims as well as the utterly indifferent actions of David
> Gorman, a nurse.   Trey Bedingfield was intentionally threatened and
> intimidated to forego medical treatment and examination for a serious
> medical condition.  The alleged decision to allow Trey Bedingfield to forego
> the endoscopy in this case, given the medical information available, plus the
> wrongful coercion of him was more than deliberate indifference, it was
> intentionally done.  Trey Bedingfield was allowed to see Dr. Russell Roberts
> on only one occasion and there was no follow up by that physician given the
> facts and circumstances of Trey's illness that were available and known to
> him.  No one encouraged, but rather discouraged, Mr. Bedingfield from
> seeking treatment and diagnostic testing.

Record Document 115-1 at 10-11.  Plaintiffs have admitted that all of Trey Bedingfield's

reported medical problems were addressed by medical personnel.  Instead, they allege that

Trey Bedingfield was ill and did not report his medical problems because of intimidation and

threats.  As stated previously, the evidence to support such allegation is hearsay and is not

competent summary judgment evidence.  Other than the intimidation and threat contention,

Plaintiffs only other denial of medical care argument relates to Trey Bedingfield's refusal

of the EGD procedure.

> At issue is Trey Bedingfield's March 9, 2008 KITE COMMUNICATION FORM,[10]

---

[10]The "KITE COMMUNICATION FORM" read:

Lt. Simms I'm suppose [sic] to go back to the Hospital on the 13th and have
a scope ran down in my stomach to check for ulcers.  Its [sic] not a life
threatening deal or anything.  I have medical insurance threw [sic] Willis

which he addressed to Assistant Warden Sims.  Plaintiffs' primary contention is that the form contains a medical question posed by Trey Bedingfield to Assistant Warden Sims. Yet, even if Trey Bedingfield's "if that's ok" language could be interpreted as a medical question, there is no summary judgment evidence to support that Assistant Warden Sims was deliberately indifferent in not interpreting the document as a request for his medical opinion.  At most, this is an example of mere negligence, which does not amount to a constitutional tort.  See Daniels, 474 U.S. at 329-30, 106 S.Ct. at 664.

Plaintiffs have presented no authority for their position that an inmate who saw a physician at the prison facility only once, but saw other medical personnel each time he made a medical complaint, supports a finding of deliberate indifference.  Moreover, Plaintiffs have offered no evidence, whether admissible or not, that Trey Bedingfield ever specifically requested to see a physician on any occasion.

The summary judgment record indicates that Trey Bedingfield saw medical personnel each time he requested medical treatment or reported any medical problems. Additionally, it has been consistently held that an inmate who has been examined by medical personnel fails to set forth a valid showing of deliberate indifference to serious medical needs.  See Norton, 122 F.2d at 292 (5th Cir.1997); Callaway, 991 F.Supp. at 809; Spears, 766 F.2d at 179; Mayweather, 958 F.2d at 91.  On this record, Plaintiffs cannot show deliberate indifference.  More specifically, they have failed to come forward with

_____

Knighton and my own doctor I've had for years.  I get out Aug 8 this year, I would rather him do this when I get out.  I would like to turn down going back to the hospital if thats [sic] ok.  I feel fine since I've been back.  Thank you.

Record Document 70, Exhibit 3 at ¶ 4, Exhibit 3-A at Bates 152, and Exhibit 4 at ¶ 2.

competent summary judgment evidence to counter Defendants' summary judgment evidence of attentive medical care, as there is simply no evidence that any employee, namely Warden Toloso or Assistant Warden Sims, were aware that Trey Bedingfield had any serious medical need that was not addressed.

Thus, based on the foregoing analysis, the Court finds that there was no deliberate indifference, i.e., no evidence that they knew of and disregarded an excessive risk to Trey Bedingfield's health or safety, on the part of Warden Toloso or Assistant Warden Sims. Summary judgment in favor of Defendants is **GRANTED** on the Section 1983 denial of medical care claim.[11]

###    C.    State Law Claim.

Under Louisiana law, the standard of care imposed upon the Department of Public Safety and Corrections in providing for the medical needs of inmates is that those services be reasonable.  See Robinson v. Stalder, 98-0558 (La.App. 1 Cir. 4/1/99), 734 So.2d 810, 812.  The statutory authority imposing this duty is found in Louisiana Revised Statute 15:760, which provides:

> Where large numbers of prisoners are confined the proper authorities in charge shall provide hospital quarters with necessary arrangement, conveniences, attendants, etc.

La. R.S. 15:760; Robinson, 734 So.2d at 812 n. 2.  The duty to provide reasonable medical care for prisoners does not require the maintenance of a full hospital at the site of each prison in order to protect an inmate against every medical risk.  See Cole v. Acadia Parish

---

[11]Plaintiffs had also asserted a Monell claim against Sheriff Deen for denial of medical care.  Because the Court has held there was no deliberate indifference, it need not reach the Monell claim.

Sheriff's Dept., 2007-1386 (La.App. 3 Cir. 11/5/08), 998 So.2d 212, 216.  However, if medical services are not available for prisoners on the prison premises, then it is the duty of confining authority to transfer a sick prisoner to a medical facility for appropriate treatment.  See Jacoby v. State, 434 So.2d 570, 573 (La.App. 1 Cir. 1983).

In opposing the Motion for Summary Judgment, Plaintiffs contend that Trey Bedingfield's one visit with a doctor at the prison was not "reasonable" and that "simply visiting with an LPN hardly constitutes reasonable medical care."  Record Document 115-1 at 12-13.  Plaintiffs also seem to argue that Trey Bedingfield should have been referred to a medical provider with more expertise and time to diagnose and treat illnesses.  See id. at 13.  However, Plaintiffs offer no case law to support their allegations.

Again, the summary judgment record evidence that Trey Bedingfield saw medical personnel each time he requested medical treatment or reported any medical problems.  There is no evidence that prison officials refused to treat Trey Bedingfield, ignored his complaints, or intentionally mistreated him.  Louisiana Revised Statute 15:760 does require that if medical services are not available for prisoners on the prison premises, prison officials must transfer the prisoner to a medical facility for appropriate treatment.  See Jacoby, 434 So.2d at 573.  The Court notes that Trey Bedingfield was transported to LSU two times and declined another trip to LSU for the EGD procedure.[12]  On this record, the

---

[12]"Under Louisiana law, law enforcement officials are not liable for injuries 'attributable to [the prisoner's] own willful act.'"  Abshure v. Prator, No. 09-30895, 2010 WL 3278256, *2 (5th Cir. Aug. 16, 2010), citing Barlow v. City of New Orleans, 241 So.2d 501, 504 (La. 1970).  In Abshure, the court held that the could not show negligence based on the actions of prison officials because he suffered injury as a result of his own "willful acts" of first checking himself out of the hospital, and then refusing to return to the hospital once he had returned to the jail.  Abshure, 2010 WL 3278256, *2.

Court finds as a matter of law that Trey Bedingfield was provided reasonable medical care under Louisiana law.

### C.      Causation.

Even if the Court had accepted the hearsay evidence as competent summary judgment evidence, Plaintiffs' Section 1983 and state law claims for denial of medical care fail due to causation.   To prevail on a Section 1983 claim, Plaintiffs "must show (1) a deprivation of a right secured by federal law, (2) that occurred under color of state law, and (3) was caused by a state actor."   Givs v. City of Eunice, 512 F.Supp.2d 522, 542 (W.D.La.,2007), citing American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977 (1999); Blessing v. Freestone, 520 U.S. 329, 340, 117 S.Ct. 1353 (1997); Daniels v. Williams, 474 U.S. 327, 330, 106 S.Ct. 662 (1986).   "[T]he plaintiff must establish a **direct causal connection** between the matter occurring under color of state law and the alleged constitutional violation."   Givs, 512 F.Supp.2d at 542 (emphasis added), citing Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force, 379 F.3d 293, 310 (5th Cir.2004); Piotrowski v. City of Houston, 237 F.3d 567, 580 (5th Cir.2001).

Likewise, under Louisiana law, Plaintiffs must also establish causation.   Mathieu v. Imperial Toy Corp., 94-0952 (La. 11/30/94), 646 So.2d 318, 322.   "[I]n order for liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); *(3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element)*; (4) the defendant's

substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element)." Id. (emphasis added).

Here, Plaintiffs simply cannot meet the causation standard under federal or state law.  March 2, 2008 was the first time that Trey Bedingfield reported any medical problem and he was sent to LSU on that date.  Defendants have presented the expert opinion of Dr. Alan Grosbach, who explained:

> Colon cancers double in size over periods of one to two months or longer. This means the metastatic tumors in Mr. Bedingfield's liver and elsewhere would have been present in March and would have been at least one-quarter to one-half the size they had achieved on CT scan and at surgery in late May.  They could not have developed *de novo* in the interval between March 4 and May 28.
>
> It is certainly true that Mr. Bedingfield's cancer probably worsened and the metastatic tumors grew during the March-May interval, but his cancer would still have been incurable had it been diagnosed in March. . . .  I believe that more likely than not Mr. Bedingfield's cancer had already progressed beyond the point of potential curability by the time of his March 2008 hospitalization. Diagnosis at that time instead of in May would not have improved his chance of survival.

Record Document 70, Exhibit 5.  This expert opinion is not challenged by any competent summary judgment evidence on the part of Plaintiffs.[13]  Thus, even if Trey Bedingfield had attended the EGD procedure on March 13, 2008 and/or reported other medical problems to prison officials, his terminal cancer diagnosis would have remained the same.

---

[13]On June 16, 2011, the Court orally granted Defendants' Motion to Strike Affidavit of Dr. Neilan Prather.  See Record Document 194.  On July 7, 2011, the Court denied Plaintiffs' Motion for Reconsideration of the oral ruling striking Dr. Prather's affidavit.  See Record Document 210.

IV.     **Denial of Visitation Claim.**

Plaintiffs allege that Trey Bedingfield was denied visitation with his family while he was ill.  They have characterized this allegation as a First Amendment claim, arguing that Trey Bedingfield had a constitutional right to communicate with family and friends.  More specifically, they argue:

> The visitation complaint arises partially and of the fact that persons at the correctional facility were not permitted to provide information regarding Trey's illness and physical condition.  They were prohibited from doing so.  Trey was prohibited by the correctional facility from notifying his mother in advance or contemporaneously with his assignment to the hospital.
>
> . . .
>
> The restrictions with respect to notification and visitation at the hospital is the source of these claims and there was no evidence of any real penological valid purpose for the application of the restrictions under the facts and circumstances of this case.

Record Document 115-1 at 9, 14.  Plaintiffs also make direct allegations relating to Warden Toloso, maintaining that he "refused visitation with the parents after they were notified their son was terminally ill."  Id. at 9.  Plaintiffs maintain that "[i]t is ridiculous to contend that [Warden] Toloso had given permission for visitation on May 31, 2008 when he was denying both the hospital's and Judge Campbell's request on dates later than that."  Record Document 115-1 at 10.

At the outset, the Court notes that while Plaintiffs contend they had to seek assistance from Retired State District Judge Cecil P. Campbell, II to obtain an order allowing visitation on June 1, 2008, there is competent summary judgment evidence indicating that Warden Toloso granted visitation and telephone privileges on May 31, 2008. In his affidavit, Warden Toloso attested that he notified LSU on May 31, 2008 that under

the circumstances visitation and telephone calls would be allowed.  <u>See</u> Record Document

70, Exhibit 2 at ¶ 8.   Additionally, the LSU Hospital Records support Warden Toloso's

attestation, as the Progress Notes state "permission granted by jail facility to notify family

of pt's situation and visitation is allowed."  <u>Id.</u>, Exhibit 8 at Bates 0492.   There is also

undisputed summary judgment evidence that Trey Bedingfield called his mother almost

daily throughout his incarceration.  <u>See</u> Record Document 115, Exhibit 9 at 40, 52-53, 180-

182

      Moreover, as argued by Defendants, restrictions on communication, telephone calls,

and visitation with a convicted prisoner, especially in an unsecure hospital, do not violate

the Eighth Amendment, whether asserted as a claim in Trey Bedingfield's survival action

or by his parents.   It is well settled in the Fifth Circuit that "[v]isitation privileges are a matter

subject to the discretion of prison officials" and that prisoners do not have a constitutional

right to visitation privileges.  <u>Berry v. Brady</u>, 192 F.3d 504, 508 (5th Cir. 1999); <u>see also</u>

<u>McCray v. Sullivan</u>, 509 F.2d 1332, 1334 (5th Cir. 1975).   Thus, summary judgment in

favor of Defendants is **GRANTED** on the visitation claim, as there is simply no evidence

of a constitutional violation.

## V.    Familial Association Claim.[14]

      Plaintiffs contend that their constitutionally protected rights of familial association and

parenthood were violated by the actions of Defendants in causing injury to their son.  <u>See</u>

---

[14]Plaintiffs concede that Mr. and Mrs. Bedingfield are precluded from bringing
survival and wrongful death actions individually.  <u>See</u> Record Document 115-1 at 15.
Instead, the Bedingfields argue that they are asserting independent causes of action arising
out of the constitutional rights of familial association and parenthood, arising under the First
and Fourteenth Amendments to the United States Constitution.  <u>See id.</u>  Plaintiffs seek to
enforce these rights through 42 U.S.C. § 1983.  <u>See id.</u>

Record Document 115-1 at15.  They further maintain that the actions of Defendants  were aimed and directed at the violation of these constitutional rights.  See id.  Plaintiffs maintain that these rights are clearly established and "that there is ample proof in the judicial decisions of other circuits and in the judicial decisions in Louisiana to show these are clearly established constitutional rights that were knowingly violated by defendants."  Id. at 16.  Plaintiffs rely heavily upon Logan v. Hollier, 711 F.2d 690 (5th Cir. 1983), Irvin v. Foti, No. 99-1526, 1999 WL 504916, *1 (E.D.La. July 13, 1999) ("Irvin I"), and Mollette v. City of Alexandria, No. 040501, 2005 WL 2445432 (W.D. La. Sept 30, 2005) for the principle that there is a constitutionally protected liberty interest in familial associations and parenthood.  See id. at 17-21.

Defendants argue that Plaintiffs have exaggerated the holdings of the aforementioned cases and instead maintain that the Fifth Circuit has never recognized a claim for familial association, even where a death is intentionally caused by law enforcement.  See Record Document 70-1 at 13.  Alternatively, Defendants maintain that even if this Court recognized the constitutional right of familial association, the right was not clearly established, thus entitling the individual defendants to qualified immunity.  See id.  Additionally, even if the right of familial association is recognized, Defendants argue  that Sheriff Deen is entitled to dismissal because there are no allegations or evidence that official policy caused Trey Bedingfield's death and therefore interfered with familial rights.

In Logan, the Fifth Circuit reviewed a case in which the mother's wrongful death claims under both Louisiana law and Section 1983 had been dismissed because the decedent was survived by a child.  The  Court vacated the judgment and remanded for a determination whether the mother had a cognizable claim under Section 1983 for injury to

a constitutionally protected liberty interest in parenthood, separate and apart from the state law wrongful death action.  See Logan, 711 F.2d at 690.  The Logan court stated:

> We vacate and remand for the determination by the district court whether Logan has a cognizable claim under § 1983 for the injury to her constitutionally protected liberty interest in parenthood, separate and apart from the state law created wrongful death action. We express no opinion as to the ultimate resolution of this inquiry.

Id. at 690-691.

In Irvin I, Judge Duval dismissed a mother's Section 1983 wrongful death claim because the victim was survived by a child, but he left open the possibility the mother could plead a claim under the theory discussed in Logan.  Judge Duval returned to the issue in Irvin v. Foti, No. 99-1526, 2000 WL 280026 (E.D.La. March 13, 2000) ("Irvin II"), wherein he observed that neither the Supreme Court nor the Fifth Circuit had yet addressed whether such a claim existed and granted the defendant sheriff qualified immunity on the grounds that there was no clearly established constitutional right of a parent to recover for intrusion on a relationship with an adult child.

Finally, Plaintiffs contend that Mollette v. City of Alexandria, No. 040501, 2005 WL 2445432 (W.D. La. Sept 30, 2005) "recognizes the existence of a right to be free from government interference with the right to familial association and that there is a cause of action for the deprivation of that right" is somewhat exaggerated.  Record Document 115-1 at 21.  In Mollette, the district court reasoned:

> The Supreme Court has recognized that each person has a freedom to enter into and maintain certain intimate human relationships and that those relationships must be secure against undue intrusion by the State.  However, the right is limited.  The most analogous, published case the Court has found discussing the right of familial association is the Tenth Circuit's decision in Trujillo v. Board of County Com'rs, 768 F.2d 1186 (10th Cir.1985). In Trujillo, the mother and sister of a man who died while incarcerated asserted their

own claims for deprivation of familial association under the First and Fourteenth Amendments. Trujillo, 768 F.2d at 1187.  The Court concluded that to state a claim for deprivation of familial association under § 1983, a plaintiff must allege that the defendant intended to interfere with a particular relationship protected by the freedom of intimate association.  The Court determined that the plaintiffs failed to plead that the defendants acted with the requisite intent. Therefore, defendant's motion to dismiss for failure to state a claim was granted even though the state may have acted improperly or unconstitutionally.

The Court adopts the same analysis the Tenth Circuit applied in Trujillo. In the case before the Court, Plaintiffs have not alleged Defendants intentionally deprived them of their right to familial association. Therefore, Plaintiffs have failed to properly allege a cause of action for deprivation of familial association and Defendants' Motion to Dismiss Plaintiffs' claim for such deprivation must be granted.

Molette, 2005 WL 2445432, *5-6.  While persuasive authority, Mollette is not binding upon this Court.  Moreover, the Court notes that Judge Duval, in Irvin II, analyzed the Trujillo decision and still concluded:

[N]either the Supreme Court nor the Fifth Circuit has directly addressed the issue of whether the parent of an adult child has a cause of action under section 1983 for injury to the right of intimate association with that child.  The constitutional question before this court is not open and shut, and there are no cases controlling in this circuit which establish such a cause of action, either with or without a requirement of demonstrating intentional conduct. The court does not find that the right to recover for the death of an adult child under section 1983 is clearly established such that a reasonable person would have been aware of the right. The court does not reach the second prong of the qualified immunity analysis.  Defendant is entitled to qualified immunity with respect to Francis' section 1983 claim.

Irvin II, 2000 WL 280026, *4.

This Court need not reach the issue of whether a right to familial association is recognized in a case such as this, as Warden Toloso and Assistant Warden Sims are clearly entitled to qualified immunity.  "Qualified immunity shields government officials from civil damages liability insofar as their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known." Pasco ex rel. Pasco v. Knoblauch, 566 F.3d 572, 578 (5th Cir. 2009).  More specifically, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . in the light of pre-existing law the unlawfulness must be apparent." Id. (internal citation and quotations omitted).  The Fifth Circuit has consistently held that the "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Id. at 578-579 (internal quotation and citation omitted).

Until recently, courts resolved government officials' qualified immunity claims under a strict two-part test, deciding (1) whether facts alleged or shown by plaintiff make out the violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct. See id. at 579, citing Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001).  "However, the Supreme Court has revisited this rule and determined that the rigid two-step structure is no longer mandatory." Id.  Thus, courts may now first consider whether the government official's conduct violated clearly established law and, if the answer is no, qualified immunity will shield the government official from suit.

Here, like Judge Duval in Irvin II, the Court notes that neither the Supreme Court nor the Fifth Circuit has yet addressed whether the parent of an adult child has a cause of action under Section 1983 for injury to the right of intimate association with that child. See Irvin II, 2000 WL 280026, *4.  Thus, Warden Toloso and Assistant Warden Sims are entitled to qualified immunity on the grounds that there was no clearly established constitutional right of a parent to recover for intrusion on a relationship with an adult child.

Likewise, Sheriff Deen is also entitled to summary judgment on the familial association claim because Plaintiffs have presented no Monell evidence.  Municipal liability under Section 1983 requires proof of three elements:  a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom.  See Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001); Monell v. Dep't of Soc. Services, 436 U.S. 658, 98 S.Ct. 2018 (1978).  In addition, not only must Plaintiffs establish that a policy or custom of the municipality was the "moving force" behind the alleged violation of a constitutional right; they must also establish that the municipality was "deliberately indifferent" to the known consequences of the policy.  See Piotrowski, 237 F.3d at 580; see also Lawson v. Dallas County, 286 F.3d 257, 264 (5th Cir.2002).  "The Fifth Circuit has noted that [Plaintiffs] bear[] an extremely heavy burden in establishing both the municipality's deliberate indifference and a causal link between the alleged custom and the alleged constitutional violation."  Peters v. City of Biloxi, 57 F.Supp.2d 366, 376 (S.D.Miss. 1999), citing Snyder v. Trepagnier, 142 F.3d 791, 798 (5th Cir.1998).

Here, Plaintiffs have come forward with no competent summary judgment evidence, or even a plausible argument, indicating that official policy caused Trey Bedingfield's death and therefore interfered with the aforementioned "familial rights."  Accordingly, summary judgment in favor of Defendants is **GRANTED** as to Plaintiffs' familial association claim.

## VI.   Consortium Claim.

Relying upon Louisiana Civil Code Article 2315, Mr. and Mrs. Bedingfield allege that they have a cause of action in their own right for loss of consortium resulting from the injury to and death of their adult son.  See Record Document 115-1 at 23.  However, Article 2315

"was amended in 1982 to provide a . . . cause of action for loss of consortium *where death does not occur*."  LeBouef v. Gross, 506 So.2d 879, 881 (La.App. 1 Cir. 1987) (emphasis added); Lee v. K-Mart Corp., 483 So.2d 609 (La.App. 1 Cir.1985); Tessier v. H.S. Anderson Trucking Co.,  713 F.2d 135, 136 (5th Cir. 1983).  Article 2315 simply has no application in this death case and summary judgment in favor of Defendants is **GRANTED**.

**VII.    Bystander Claim.**

Mr. and Mrs. Bedingfield allege that they have their own independent cause of action for the recovery of damages for mental anguish they sustained under Louisiana Civil Code Article 2315.6, which provides:

A.    The following persons *who view an event causing injury to another person, or who come upon the scene of the event soon thereafter*, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury:

(1)    The spouse, child or children, and grandchild or grandchildren of the injured person, or either the spouse, the child or children, or the grandchild or grandchildren of the injured person.

(2)    The father and mother of the injured person, or either of them.

(3)    The brothers and sisters of the injured person or any of them.

(4)    The grandfather and grandmother of the injured person, or either of them.

B.    To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. . . .

La. C.C. Art. 2315.6 (emphasis added).  More specifically, Plaintiffs' counsel argues that "the conduct of the defendants was directed at the parents by intentional action prohibiting disclosure of Trey Bedingfield's medical condition and/or the seriousness of it to Mr. and Mrs. Bedingfield."  Record Document 115-1 at 24.

This claim fails as a matter of law because Mr. and Mrs. Bedingfield acquired knowledge of their son's injury after the fact.  In Trahan v. McManus, 728 So.2d 1273 (La.1999), the Louisiana Supreme Court reasoned that the "event" contemplated by Article 2315.6(A) must be "an injury causing-event in which the claimant was contemporaneously aware that the event caused harm to the direct victim."  Id. at 1280.  The Trahan court further stated:

> The requirements of Article 2315.6, when read together, suggest a need for temporal proximity between the tortious event, the victim's observable harm, and the plaintiff's mental distress arising from an awareness of the harm caused by the event.

Id. at 1279.  Here, Mr. and Mrs. Bedingfield complain of the alleged denial of medical treatment for their son from March 2008 to May 2008.  They learned of their son's illness on June 1 and then visited him later that day at LSU.  These undisputed facts show that the Bedingfields arrived after the alleged denial of medical care and "they do fit within the framework of Article 2315.6 or the case law interpreting it."  Kipps v. Caillier, 197 F.3d 765, 771 (5th Cir. 1999).  Accordingly, summary judgment in favor of Defendants is **GRANTED** as to the bystander claim under Article 2315.6.

**VIII.   Subrogation Claim.**

Mr. and Mrs. Bedingfield also assert a claim for the expenses they incurred for the

funeral of their adult son.  Pursuant to Louisiana Civil Code Article 1825,[15] they contend that they are legally subrogated into this proceeding to recover the funeral expenses.  The Bedingfield explain their claim as follows:

> The basis of such a claim on the part of the parents springs from the concept of legal subrogation . . . under which subrogation is merely the substitution of one person to the rights of another.  Subrogation results from a person's performance of the obligation for another, which obligation subsists in favor of the person who performed it and **who may avail himself of an action against the obligor (in this case, the wrongdoer who is the Bossier Parish Sheriff and the other defendants)**.

Record Document 115-1 at 25 (emphasis added).

Conversely, Defendants contend that the Bedingfields' payment of the funeral expenses, which was not their legal obligation, does not make them proper plaintiffs in this proceeding.  While Defendants acknowledge that funeral expenses are appropriately awarded as part of a wrongful death action, they note that such a claim can only be asserted by a proper plaintiff – in this matter, Trey Bedingfield's minor daughter, Elizabeth Macy Bedingfield, through her mother, April Nicole Bedingfield.

While the Court finds that Defendants' legal position likely has merit, it need not reach this issue because the Bedingfields have premised their legal subrogation against Defendants on a finding that there was wrongdoing on the part of "the Bossier Parish Sheriff and the other defendants."  Record Document 115-1 at 25 ("Subrogation results from a person's performance of the obligation for another, which obligation subsists in favor of the person who performed it and who may avail himself of an action against the obligor

---

[15]Article 1825 provides:

Subrogation is the substitution of one person to the rights of another. It may be conventional or legal.

(in this case, the wrongdoer who is the Bossier Parish Sheriff and the other defendants).").

This Court previously held that Plaintiffs' denial of medical care claim, loss of familial

association claim, denial of visitation claim, loss of consortium claim, and bystander claim

fail.   Thus, there has been no wrongdoing on the part of Sheriff Deen or the other

Defendants and Plaintiffs may not "avail" themselves against Defendants.   Id.   Summary

judgment in favor of Defendants is, therefore, **GRANTED** as to Plaintiffs' subrogation claim.


### CONCLUSION

Based on the foregoing analysis, the Court finds that summary judgment in favor of

Defendants is appropriate as to all claims.   A judgment consistent with the terms of the

instant Memorandum Ruling shall issue herewith.   The Clerk of Court is further directed to

close this case.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 27th day of July, 2011.


_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE